IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| AINSLEY S. KELLY, survivor of<br>Jessi-Kealoha Phoenix, | ) | Civil No. 09-6324-JE |
| | ) | |
| Plaintiff, | ) | FINDINGS AND |
| | ) | RECOMMENDATION |
| v. | ) | |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

Drew L. Johnson,
1700 Valley River Drive
Eugene, OR 97405

Kathryn Tassinari
Harder, Well, Baron & Manning, P.C.
474 Willamette, Suite 200
Eugene, OR 97401

    Attorneys for Plaintiff

FINDINGS AND RECOMMENDATION - 1

Adrian L. Brown
Asst. U.S. Attorney
1000 S.W. 3rd Avenue, Suite 600
Portland, OR 97204

Gerald J. Hill
L. Jamala Edwards
Social Security Administration
Office of General Counsel
701 Fifth Avenue, Suite 2900 M/S 221A
Seattle, WA 98104-7075

        Attorneys for Defendant

JELDERKS, Magistrate Judge:

Jessi-Kealoha Phoenix (Phoenix) brought this action pursuant to 42 U.S.C.§§ 405(g) and 1383(c) seeking judicial review of a final decision of the Commissioner of Social Security (the Commissioner) denying his application for Disability Insurance Benefits (DIB). Phoenix sought an Order remanding this action to the Social Security Administration (the Agency) for an award of benefits. Following the death of Phoenix, Ainsley S. Kelly, Phoenix's daughter, was substituted as the plaintiff.

The Commissioner concedes that the ALJ committed several errors, but contends that the action should be remanded for further proceedings rather than for an award of benefits. He seeks an Order remanding the action to the Agency for such proceedings.

For the reasons set out below, the Commissioner's motion to remand for further proceedings should be denied, and the action should be remanded for an award of benefits.

**Procedural Background**

Phoenix filed an application for DIB on August 17, 2004, alleging that he had been disabled since December 1, 1998. After his application was denied initially and upon reconsideration, he timely requested a hearing before an Administrative Law Judge (ALJ).

On December 11, 2006, a hearing was held before ALJ William Stewart, Jr. In an opinion dated March 30, 2007, ALJ Stewart found that Phoenix was not entitled to benefits. That decision became the final decision of the Commissioner on September 21, 2009, when the Appeals Council denied plaintiff's request for review.

Phoenix brought the present action to seek judicial review of the Commissioner's decision. As noted above, Phoenix has since died, and his daughter, Ainsley Kelly, has been substituted as the plaintiff in this action.

**Factual Background**

Phoenix was born on September 19, 1946, and was 60 years old at the time of his hearing before the ALJ. He graduated from high school and attended college for 18 months. Phoenix served in the United States Marines from April 1, 1966, to March 21, 1969, when he was honorably discharged. During military service, Phoenix played in a military band. He had past relevant work experience as an EMT, a telephone solicitor, and a bartender.

Phoenix had a significant history of alcohol and drug abuse.

**Medical Record**

On May 13, 1993, Nancy Odell and Dr. H. Westley Clark of the San Francisco Veterans' Administration (VA) Substance Abuse/Post Traumatic Stress Team (SUPT)

FINDINGS AND RECOMMENDATION - 3

prepared a report describing Phoenix's psychiatric and clinical condition.  The report stated that Phoenix had been stationed in Vietnam from May, 1968, to March, 1969, as a member of the 1st Division Band.  Phoenix stated that he had been stationed near enemy lines, had been on an aircraft that had been attacked, and on the ground had received incoming fire from small arms, artillery, rockets, and mortars.  He reported that his mistrust of authority and his stress had been exacerbated by being in defenseless positions while playing at "change of command" parades.  Phoenix said that he had seen American soldiers being  killed, and that his base camp had been overrun by the North Vietnamese Army once while he was stationed there.

Phoenix reported that, after being discharged from the military, he had experienced feelings of rage towards authority, nightmares, depression, and guilt.  He said that he began abusing alcohol and drugs, and that he had withdrawn from his family and friends.  Phoenix stated that he had attended college, but had dropped out because of poor concentration.  He also reported that he had attempted suicide three times, had "fitful rages," had been fired from several jobs, and had two failed marriages.

Odell and Clark noted that Phoenix had been hospitalized in a psychiatric unit in 1973 because of a severe depressive episode, had received "intermittent" counseling from a Veterans' center in 1983, sought outpatient treatment in 1986, and received "intermittent" counseling from a Veterans' center in San Francisco from 1988 to 1991.  They noted that he completed two of four phases of the VA's SUPT program in 1991, and was subsequently hospitalized in the San Francisco VA Medical Center's Substance Abuse Inpatient Unit for two weeks.  During the first phase of the program, Phoenix had been fired for "raging at someone at work," and had separated from his wife and started drinking heavily.

Odell and Clark reported that, on admission, Phoenix had an "anxious mood and sad affect."  His attention and memory were rated as "adequate," and there was no evidence of a thought disorder.  Based upon his history and testing administered by the SUPT program, Odell and Clark concluded that Phoenix's social and occupational functioning were impaired because of Post Traumatic Stress Disorder (PTSD).  They diagnosed PTSD and alcohol dependence with a history of polysubstance abuse.

Phoenix was admitted to the Roseburg, Oregon VAMC for detoxification from alcohol and marijuana in January, 1995.  He was discharged on January 30, 1995, with a diagnosis of polysubstance abuse, depression, and PTSD.

In May, 1996, Phoenix sought treatment for alcohol abuse.  Phoenix reported that he had a 28-year history of alcohol abuse, a 28-year history of marijuana use, and a 4-year history of using tranquilizers and barbiturates many years earlier.  Roland Kimbrough, an addiction therapist, noted that Phoenix presented with a "dysphoic mood, with restricted affect."

Pursuant to his request for an increase in his VA disability rating, Phoenix was examined by Dr. Donald Martindill on September 24, 1996.[1]  Dr. Martindill reported that Phoenix "suggest[ed] he has nightmares, flashbacks, intrusive thoughts, depression, avoidant behavior, etc."  He stated that "it would appear" that Phoenix had experienced problems with PTSD "for many years."  Dr. Martindill reported that plaintiff "was cooperative, but very dull and passive-aggressive" and "was somewhat laid back and appeared to be bored" and "burned out."  He observed no evidence of schizophrenia, bipolar disorder, or organic brain dysfunction.  Phoenix's "mini-mental status examination" was consistent with untreated

_____

[1]Phoenix had  30% disability rating at the time, based upon PTSD.

PTSD and "polysubstance and alcohol abuse."  Dr. Martindill characterized Phoenix as "competent," and diagnosed PTSD; alcohol abuse, possibly in early remission; and polysubstance abuse, in partial remission.  He rated plaintiff's Global Assessment of Functioning (GAF) at 50 at that time, and during the previous year.

In October, 1996, Phoenix's VA PTSD disability rating was increased to 50%.  The report setting out that decision noted that this level of disability indicated that Phoenix's "ability to establish or maintain effective or favorable relationships with people" was "considerably impaired," and that his  "reliability, flexibility, and efficiency levels" were "so reduced as to result in considerable industrial impairment."

Dr. Victor Kops, a psychologist, examined plaintiff in January, 1999.  Dr. Kops reported that, even when he was sober, Phoenix could not follow orders or concentrate for any reasonable period of time.  He noted that plaintiff changed jobs frequently, and diagnosed PTSD and alcohol abuse.  Dr. Kops rated Phoenix's GAF at that time at 30, with a high of 40, and opined that his prognosis was "Poor."  He opined that Phoenix's "ability to function at a job" was "negligible," and encouraged him to enter a long-term residential program for his alcoholism and PTSD.

On March 8, 1999, Phoenix declined the VA's offer of inpatient treatment after reviewing an inpatient information packet and becoming "frustrated and angry about the rules and structure" that would be imposed.  However, he was admitted for detoxification on March 22, 1999.  Intake records indicated that Phoenix had been drinking a fifth of tequila "on a daily basis" and consuming marijuana "when he ha[d] the money."  He had severe tremors, and was described as anxious, irritable, and "excessively suspicious."

Dr. Peggy Pazzaglia, a psychiatrist, evaluated Phoenix on March 23, 1999. Phoenix told her that he had relapsed after five years of sobriety, while working towards his certification as a paramedic. Dr. Pazzaglia observed that Phoenix was "quite orderly" and made an "effort to control his comportment." She diagnosed alcohol abuse and dependence and PTSD complicated with intermittent explosive disorder, and rated Phoenix's GFA at 45.

Phoenix was discharged from the detox program at the end of March, 1999, and immediately entered a 28-day VA Substance Abuse Residential Rehabilitation Treatment Program. Upon admission, his mood was noted as anxious and irritable, and his GAF was assessed at 40. Testing indicated that his cognitive processing speed, coping ability, and flexible problem-solving skills were in the normal range.

In a chart note dated April 7, 1999, Michael Hendricks, a clinical social worker, noted that "[t]he treatment team was impressed by [Phoenix's] level of system dependency and anger from both PTSD and general dysfunctionality." He added that Phoenix "seems to have little investment in change and incredible antagonism for therapists" and seemed to "have contempt for institutions." Hendricks described Phoenix as "extremely avoidant." In a chart noted dated April 16, 1999, J. Keith Arseneax, an addictions specialist, reported that Phoenix had "made little progress with his perceived victim stance, which keeps him locked into his anger." Phoenix was discharged from the program on April 26, 1999. His prognosis on discharge was assessed as "guarded" because of his "continued willfulness and apprehension regarding interacting with general society."

The following day, Phoenix was admitted to the PTSD treatment program at VAMC's American Lake facility. Phoenix appeared to be anxious, vigilant, guarded, and slightly depressed on admission, and he reported intrusive thoughts, nightmares, hyper vigilance,

FINDINGS AND RECOMMENDATION - 7

restricted range of emotion with anger outbursts, social isolation, flashbacks, and depression during treatment.  He reported that some of his symptoms worsened during the treatment program, and his GAF was assessed at 41 shortly before he was discharged on June 1, 1999.

Pursuant to his request that the VA increase his disability rating, Phoenix was examined by Dr. Allan Warner, a psychiatrist, on June 1, 1999.  Phoenix told Dr. Warner that some of his PTSD symptoms had worsened after he resumed sobriety, and reported being particularly limited by a "high level of irritability with almost instant escalation to full rage. . . . "  Though he took a number or medications, Phoenix reported that he continued to have vivid nightmares and daily intrusive thoughts about Vietnam.  Phoenix also reported that, though he had taken a number of anger management classes, anger continued to be a "monumental problem" for him.  Dr. Warner noted that Phoenix "seemed unable to get beyond the constant anger patterns which have proven extremely unproductive in his life," and noted that his irritability and anger made it difficult to comply with the treatment program.  He stated that Phoenix had a high level of persistent PTSD symptoms, and was having difficulty complying with the program because of his irritability and anger.  In summarizing Phoenix's condition, Dr. Warner stated that he

> has shown marked occupational and social impairment.  He has had ongoing mood problems minimally associated with his PTSD.  His family relations are chaotic and his industrial adjustment is wretched.  He appears chronically depressed and has markedly impaired impulsive control and has engaged in physical aggression at times over less than life-threatening provocations.  He handles stress very poorly (even in sheltered treatment settings) and seems unable to maintain effective relationships in or out of the workplace with mature adults.

> Barring some unseen breakthrough in this patient's treatment or his response to it, it appears extremely unlikely to this examiner that he will reenter the competitive workplace in any sustained fashion in the foreseeable future.

FINDINGS AND RECOMMENDATION - 8

He diagnosed PTSD, chronic, severe, with depression; Alcohol Abuse, in recent early remission, and Cannibinoid abuse/dependence, in early remission.  Dr. Warner rated Phoenix's GAF at 45.

In June, 1999, the VA granted Phoenix a 100% disability, based upon his PTSD.

In a telephone call to the VA to obtain a refill of medications on July 26, 1999, Phoenix said that he had not established medical care in Seattle as planned, and that he and his wife intended to travel around the United States for a few years.

On March 12, 2001, Phoenix sought psychiatric medication at the VAMC in Grand Junction, Colorado.  He reported that he had had 162 jobs since 1969, and that he was "always anxious any time he leaves his home."  His GAF was assessed at 48.

Dr. Jennifer Kennedy, a VA staff psychiatrist, assessed Phoenix because of his concerns about his irritability, tendency to isolate, depression, substance abuse, and anxiety. Phoenix said that he had received treatment at the VA in San Diego in 2000, and that he had been living in Mexico recently.  He reported that, during recent months, he had consumed up to four alcoholic drinks once every two to three months, and that he had smoked marijuana two or three times per month.  Dr. Kennedy indicated that Phoenix was mildly anxious, mildly to moderately depressed, somewhat hyper-vigilant, and significantly guarded.  She prescribed nefazodone, tegretol, and trazodone, assessed Phoenix's GAF at 45, and advised Phoenix to maintain sobriety.

On July 31, 2001, Dr. Kennedy offered Phoenix admission to a psychiatric unit and offered to change his medications after Phoenix reported that he had experienced a number of  "rages" after seeing obituaries of men killed in Vietnam.  Phoenix declined these offers.

Dr. Kennedy advised Phoenix to "seriously reconsider" a planned trip to the Philippines, based on her concern that the jungle would remind him of experiences in Vietnam.

Upon returning from a six-month trip to the Philippines, in March, 2002, Phoenix sought treatment for increased episodes of rage, which he reported had increased from two per year to two or three per week. Phoenix reported that he had used alcohol while in the Philippines, and was admitted to the Roseburg, Oregon VAMC for anger control problems, depression, and suicidal ideation. He was described as impulsive and resistive, and his GAF was rated at 37. Phoenix interacted little with staff and other patients, and was repeatedly described as "isolating." Upon his discharge on March 12, 2002, Phoenix was diagnosed with PTSD; Dysthymia; Alcohol Abuse; and Personality Disorder, NOS. His GAF upon discharge was rated at 40.

When he returned to the Roseburg VAMC for medication refills in June, 2002, it was noted that Phoenix was alternately living in the United States and the Philippines for three-month intervals. In a chart note dated May 22, Heidi Lundeen, a psychiatrist, reported that Phoenix showed some psychomotor retardation, with a paucity of movement, a vacant gaze, and constricted affect.

In a chart noted dated February 10, 2004, Phoenix was described as mildly depressed, and "somewhat drowsy and inattentive with frequent needs to repeat." Dr. Raymond Slezynski, a VA psychiatrist, opined that Phoenix appeared to be excessively medicated, and noted that Phoenix said that he needed to tolerate these side effects "in order to be anxiety and nightmare free." The following month, Phoenix reported that he had become increasingly jittery, and had hand tremors, balance issues, and occasional confusion. Chart notes dated September 10, 2004, indicate that Phoenix was mildly depressed, and told his

doctor that he thought the benefits of staying on multiple psychotropic medications outweighed the potential risks.  His diagnosis included PTSD, Nicotine dependence, Alcohol dependence (in full sustained remission) and Cannabis dependence (in full sustained remission).

Chart notes dated February 9, 2005, indicated that Phoenix had a depressed mood and blunted affect, and showed some psychomotor retardation.  He reported depression, anxiety, intrusive memories of Vietnam, and what his doctor thought may have been a dissociative episode.  Phoenix stated that he had not used street drugs or alcohol since 1999.

In March, 2005, Phoenix was diagnosed with moderate to mild obstructive sleep apnea.

In June, 2005, Phoenix told his doctor that he had some intrusive memories of trauma and had nightmares every night, but was doing much better overall.  His affect was characterized as blunt, and his GAF was rated at 45.

In October, 2005, Phoenix was described as anxious, and he reported experiencing nightmares, flashbacks, and intrusive and depressing thoughts.  His impulse control was described as poor.

**Hearing Testimony**

1. **Phoenix's testimony**

Phoenix testified as follows at the hearing.

Phoenix had been fired from his EMT job because he "raged" at a co-worker, and had been advised not to return to that work because of stress.  He had difficulty following rules,

taking direction, and tolerating authority.  Sometimes he would quit a job because he could not stand being around authority.

Phoenix had not consumed alcohol or taken drugs since May, 2003, some three years earlier.  His symptoms had not improved since he stopped drinking and using drugs, and he continued to experience the symptoms of PTSD.  Though heavy medication reduced the frequency and severity of his symptoms, he continued to have significant mental problems.  When he was working, he had episodes of rage on a weekly basis.  With medication, these were reduced to once or twice a month.  Phoenix was afraid to go anywhere because of concern that someone would "set him off."  His only friend was an ex-girlfriend with whom he had a daughter.  Since 2001, Phoenix had been visiting the Philippines regularly.  He had a wife and two children there.


2. **Vocational Expert's testimony**

The ALJ posed a hypothetical for the VE  describing an individual of Phoenix's age, education, and experience, who without the use of alcohol or drugs, was unable to interact appropriately with the public, was unable to maintain ongoing cooperative teamwork interactions, and who "would do best in relative isolation with minimal interaction with others."  The ALJ added that the described individual would not do well in a "rule intensive environment," or with "a rigid hierarchy or authority," would need "a predictable routine with work changes minimized," and would be unable to consistently follow detailed instructions.

The VE testified that an individual with these limitations could not perform Phoenix's past work, but could work as a "Cleaner Commercial Institutional," a "Sweeper Cleaner Industrial," or a "Touch Up Screener/Printer Circuit Board Assembler."

In response to questioning by Phoenix's attorney, the VE testified that a marked limitation in the ability to accept instructions and respond appropriately to criticism from supervisors would preclude any sustained competitive employment, and that the jobs he had identified would all require at least occasional contact with a supervisor.  The VE testified that it would not be acceptable for an employee to have an episode of rage weekly, and that an employee would be expected to interact appropriately.

## ALJ's Decision

At the first step of his disability analysis, the ALJ found that Phoenix had met the insured status requirement for DIB through December 1, 1999, and that he had not engaged in substantial gainful activity since that time.

The ALJ next found that Phoenix's severe impairments included PTSD, complicated by issues of intermittent explosive disorder, personality disorder, alcohol dependence, and cannabis abuse.  He also found that, when Phoenix abused alcohol and drugs, his PTSD and personality disorder were severe enough to meet the "listings."  He further found that, though Phoenix's impairments would continue to be severe even if he did not use drugs and alcohol in the absence of substance abuse, the impairments would not meet the "listings" and Phoenix would retain the functional capacity required to perform "all exertional levels of work," subject to certain limitations.  These limitations included an inability to "interact appropriately" with the public, inability to maintain "ongoing cooperative teamwork interactions," and inability to "consistently follow detailed instructions."  In addition, Phoenix would "do best in relative isolation with minimal interaction with others," would require a

predictable routine with minimal changes, and would "not do well in a rule-intensive environment or with rigid hierarchy or authority."

In analyzing Phoenix's residual functional capacity, the ALJ found that, if Phoenix did not abuse alcohol and drugs, his medically determinable impairments could reasonably be expected to produce some of the symptoms he alleged, but that his statements concerning the severity of his symptoms were not entirely credible.

The ALJ found that Phoenix's substance abuse was material to his disability, in that, though he would not be able to perform his past relevant work even in the absence of such abuse, he could work as an institutional or commercial cleaner, an industrial sweeper/cleaner, or a touch-up screener/printed circuit board assembler if he did not engage in substance abuse.

## **Standard of Review**

A claimant is disabled if he or she is unable "to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The initial burden of proof rests upon the claimant to establish his or her disability. Roberts v. Shalala, 66 F.3d 179, 182 (9th Cir. 1995), cert. denied, 517 U.S. 1122 (1996). The Commissioner bears the burden of developing the record. DeLorme v. Sullivan, 924 F.2d 841, 849 (9th Cir. 1991).

The district court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g); see also Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995).

"Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Andrews, 53 F.3d at 1039. The court must weigh all of the evidence, whether it supports or detracts from the Commissioner's decision. Martinez v. Heckler, 807 F.2d 771, 772 (9th Cir. 1986). The Commissioner's decision must be upheld, however, even if "the evidence is susceptible to more than one rational interpretation." Andrews, 53 F.3d at 1039-40.

### Discussion

Plaintiff contends that the ALJ erred in finding that drug and alcohol use was material to Phoenix's disability, in light of the opinions of Dr. Warner, Dr. Kops, and lay evidence provided by Teresa Kelly, the mother of two of Phoenix's children. Plaintiff also contends that the ALJ erred in failing to give the appropriate weight to the VA's conclusion that Phoenix was 100% disabled, failed to provide the requisite support for his conclusion that Phoenix was not wholly credible, and failed to meet his burden of establishing that Phoenix retained the ability to perform "other work" that existed in the national economy.

The Commissioner concedes that the ALJ erred in failing to provide sufficient reasons for rejecting the opinions of Dr. Warner and Dr. Kops, and for rejecting lay testimony of Ms. Kelly, and concedes that these errors require a remand for further proceedings. He asserts that the ALJ did not err in evaluating Phoenix's testimony, or in evaluating the VA's disability determination.

1. **Opinions of Drs. Warner and Kops, lay evidence, and materiality of Phoenix's substance abuse to his disability**

In 1996, Congress amended the definition of disability under the Social Security Act to provide that "[a]n individual shall not be considered to be disabled . . . if drug addiction or alcoholism would . . . be a contributing factor material to the Commissioner's determination that the individual is disabled." 42 U.S.C. § 423(d)(2)(C).  In determining whether substance abuse is a contributing factor that is material to the determination of disability, the "key factor" is whether the individual in question would still be found to be disabled if he or she stopped using drugs or alcohol.  20 C.F.R. § 404.1535(b)(2); Sousa v. Callahan, 143 F.3d 1240, 1245 (9th Cir. 1998).  In evaluating whether an individual would be disabled if he or she stopped using drugs or alcohol, the Commissioner is required to examine which of the claimant's physical or mental limitations would remain if the individual stopped using drugs or alcohol, and then determine whether any of the remaining limitations would be disabling. 20 C.F.R. § 404.1535(b)(2).

Plaintiff contends that the ALJ erred in finding that Phoenix's substance abuse was material to his disability, because the record establishes that his PTSD continued to be disabling even during periods in which he was sober.  Plaintiff asserts that the ALJ failed to properly consider evidence from Drs. Warner and Kops, and from plaintiff herself, which established that Phoenix's PTSD was disabling even when he was sober.

a. **Opinion of Dr. Warner**

Dr. Warner, an examining psychiatrist, evaluated Phoenix in July, 1999, after he had been sober for approximately two months.  As noted above, Dr. Warner reported that

Phoenix "seemed unable to get beyond the constant anger patterns which have proven extremely unproductive in his life," and noted that his irritability and anger made it difficult to comply with the treatment program.  He opined that Phoenix had a high level of persistent PTSD symptoms "despite a great deal of treatment," and was having difficulty complying with the program because of his irritability and anger.  Dr. Warner stated that Phoenix had shown "marked occupational and social impairment," had "ongoing mood problems minimally associated with his PTSD," and demonstrated an "industrial adjustment" that was "wretched."  Dr. Warner noted that Phoenix appeared to be "chronically depressed," had "markedly impaired impulsive control," and had "engaged in physical aggression at times over less than life-threatening provocations."  He noted that Phoenix handled stress very poorly, even in sheltered treatment settings, and seemed unable to maintain "effective relationships in or out of the workplace with mature adults."  Dr. Warner opined that, barring some "unseen breakthrough," it appeared extremely unlikely that Phoenix would "reenter the competitive workplace in any sustained fashion in the foreseeable future."

After summarizing Dr. Warner's report, the ALJ simply noted that Phoenix was "very focused on resisting rules," seemed "almost to seek out conflict in any situation," and "want[ed] to blame others for everything without assuming responsibility for what he can change about his situation."  He also observed that Phoenix appeared to have "a good grasp on his limits, but refuses to use this awareness to change his attitude."

It is not clear whether the ALJ intended these observations to support his rejection of Dr. Warner's conclusions concerning the nature and severity of Phoenix's mental impairments.  If he intended them as a basis for discrediting Dr. Warner's conclusion that Phoenix's mental impairments were disabling even when Phoenix was sober, they are far

from adequate: Assuming that the ALJ's observations are true, they in no way undermine Dr. Warner's opinion that Phoenix's PTSD symptoms were persistent despite "a great deal of treatment," and were sufficiently severe to prevent his return to competitive employment. Because Dr. Warner examined and evaluated Phoenix when he had been sober for some time, his opinion is directly at odds with the ALJ's conclusion that, but for his abuse of alcohol and drugs, Phoenix would not have been disabled.

The opinions of an examining physician like Dr. Wagner are entitled to significant weight. See, e.g., Pitzer v. Sullivan, 908 F.2d 502, 506 (9th Cir. 1990) (ALJ must provide clear and convincing reasons for rejecting uncontradicted opinions of examining physician); Andres v. Shalala, 53 F.3d 1035, 1043 (9th Cir. 1995) (ALJ must provide specific and legitimate reasons, supported by substantial evidence in record, for rejecting examining physician's contradicted opinion). Because it does not appear that Dr. Wagner's opinions were contradicted by other medical opinions in the record, the ALJ was required to provide clear and convincing reasons for their rejection. If other opinions could be construed as contradicting those of Dr. Wagner, the ALJ would have been required to provide "specific and legitimate" reasons for their rejection. Here, the ALJ did not provide reasons that met either of those standards, because his observations about Phoenix's failure to assume responsibility were in no way inconsistent with Dr. Wagner's opinions as to the nature and severity of Phoenix's PTSD impairment.

When an ALJ provides inadequate reasons for rejecting the opinion of a treating or examining physician, that opinion is credited as a matter of law. Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1995). A reviewing court then has discretion to remand the action for further proceedings or for a finding of disability and an award of benefits. See, e.g, Stone v.

Heckler, 761 F.2d 530, 533 (9th Cir. 1985).  Whether an action is remanded for an award of

benefits or for further proceedings depends on the likely utility of additional proceedings.

Harman v. Apfel, 211 F.3d 1172, 1179 (9th Cir. 2000).  A reviewing court should credit the

evidence and remand for a finding of disability and an award of benefits if: 1) the ALJ failed

to provide legally sufficient reasons for rejecting the evidence; 2) there are no outstanding

issues to be resolved before a determination of disability can be made; and 3) it is clear from

the record that the ALJ would be required to find the claimant disabled if the evidence in

question were credited.  Smolen v. Chater, 80 F.3d 1273, 1292 (9th Cir. 1996).

Here, the ALJ did not provide legally adequate reasons for rejecting Dr. Wagner's

opinion as to the nature and severity of Phoenix's mental impairments.  There are no

outstanding issues to be resolved before a determination of disability can be made, and it is

clear that, if  Dr. Wagner's opinion had been credited, the ALJ could have only concluded

substance abuse was not material to Phoenix's disability.  Under these circumstances, the

action should be remanded for an award of benefits.

b.  **Opinion of Dr. Kops**

Dr. Victor Kops, a psychologist, reviewed Phoenix's records and examined Phoenix in

January, 1999, before he went through a detox program.  Dr. Kops reported that, even when

he was sober, Phoenix could not follow orders or concentrate for any reasonable period of

time.  He noted that plaintiff had changed jobs frequently, and had "acquired and lost"

approximately 150 jobs since he was discharged from the Marines.  Dr. Kops diagnosed

PTSD and alcohol abuse, rated his GAF at that time at 30, with a high of 40, and opined that

his prognosis was "Poor."  He opined that Phoenix's "ability to function at a job" was

"negligible."

The ALJ did not discuss Dr. Kops' evaluation or give any reasons for failing to credit his opinions as to the severity of Phoenix's impairments or their persistence during periods when Phoenix was sober. It is clear that, in addition to examining Phoenix, Dr. Kops reviewed his records. His opinion provided substantial support for the conclusion that Phoenix's substance abuse was not material to his disability. Even if that opinion was contradicted by other medical opinions in the record, which does not appear to be the case, the ALJ would have been required to provide specific and legitimate reasons for its rejection. In the absence of any discussion of Dr. Kops' opinions, the ALJ of course failed to satisfy this requirement.

The opinions of Dr. Kops, like those of Dr. Wagner discussed above, supported the conclusion that Phoenix's PTSD was disabling whether or not Phoenix was abusing substances. His opinions were consistent with other substantial evidence indicating that substance abuse was not material to Phoenix's disability. This includes evidence that, while Phoenix was sober, he lost employment many times because of anger problems. He was fired from his EMT job for raging at a co-worker, and was advised not to return to that type of work because of stress. There is ample evidence that his PTSD-related impairments worsened throughout the 1990s whether or not he maintained his sobriety.

c. **Lay evidence**

Teresa Kelly, the mother of two of Phoenix's children, completed a Third Party Function Report in 2004. Kelly reported that she saw Phoenix for two weeks at a time every few months, and that she had known him for 18 years. She stated that Phoenix would not speak to people willingly, could not concentrate long enough to complete some tasks, was

forgetful and often argumentative, and handled stress by getting angry.  Kelly reported that Phoenix became angry and went into hiding on the Fourth of July, and that he "used to drink heavily to cope with stress and anger."  Kelly's reference to Phoenix's drinking in the past tense indicates that her comments about his impairments generally addressed his condition when sober.

The ALJ briefly summarized Kelly's report, noting only that she stated that he did not have to do chores while he was her houseguest, regularly went to church and to the library to use the computer, took "fantastic photos when he did photography," liked to read, and had little patience with others.  He did not mention most of Kelly's observations which supported the conclusion that Phoenix was disabled, even when he was sober.

The Commissioner now argues that Kelly's "opinions" concerning Phoenix's "anti-social behavior are consistent with the ALJ's residual functional capacity assessment" and "[t]hus . . . may not establish that Mr. Phoenix was disabled during periods when he was able to control his drug addiction and alcoholism."  I disagree.  Kelly's statements support the conclusion that substance abuse was not material to Phoenix's disability:  Given the ALJ's contrary conclusion, I must assume that the ALJ rejected the bulk of her relevant evidence.  This was, of course, an error, because an ALJ must provide reasons that are "germane" for discounting the evidence provided by a lay witness.  Dodrill v. Shalala, 12 F.3d 915, 918-19 (9th Cir. 1993).

If the ALJ's failure to adequately address lay evidence were the only error, I would not recommend remanding this action for an award of benefits, but instead would recommend remanding for further evaluation, as the Commissioner requests.  However, as noted above, the ALJ also erred in failing to provide reasons for rejecting the opinions of evaluating

physicians.  As discussed below, the ALJ erred as well in failing to provide adequate reasons

for failing to give greater weight to the VA's conclusion that Phoenix was completely

disabled.


2. **VA's Determination of Disability**

The VA's increase in Phoenix's disability rating from 50% to 100% in 1999, based

upon PTSD, followed Dr. Warner's evaluation of Phoenix during a period of sobriety, and

Dr. Kops' conclusion that, even when he was sober, Phoenix could not follow orders or

concentrate for any reasonable period of time.  The ALJ did not "call into question" the VA's

decision that Phoenix was fully disabled, but stated that Social Security analysis of disability

differs from that of the VA, in that the former prohibits an award of benefits where substance

abuse is material to disability, while the latter does not.  The ALJ also asserted that certain

steps in the Social Security "sequential analysis" differ from the VA disability analysis.

Plaintiff contends that the ALJ did not give sufficient weight to the VA's 100%

disability rating.  Given that the VA's decision was based upon a VA psychiatrist's evaluation

conducted during a period in which Phoenix was sober, and that another VA psychiatrist

found that Phoenix could not follow orders or concentrate for any reasonable period of time

even when he was sober, I agree.  The Ninth Circuit Court of Appeals has noted that, though

a "VA rating of disability does not necessarily compel the SSA to reach an identical result . . .

the ALJ must consider the VA's findings in reaching his decision."  McCartey v. Massanari,

298 F.3d 1072, 1076 (9th Cir. 2002).   Given the "marked similarity" between Social Security

and VA disability programs, an ALJ must "ordinarily give great weight to a VA

determination of disability."  Id.  An ALJ who does not accord this weight to a VA disability

determination must "give persuasive, specific, valid reasons for doing so that are supported by the record."  Id.

The VA's disability determination here was significant because it was made during a period when Phoenix was sober and it was based at least in part on the opinion of a medical expert who opined that Phoenix could not follow orders or concentrate even when he was sober.   This determination supported the conclusion that substance abuse was not material to Phoenix's disability.  The ALJ, who agreed that Phoenix was disabled, did not give the conclusion that substance abuse was not material to plaintiff's disability the "great weight" that it should have carried.


### 3. **Phoenix's Credibility**

The parties disagree as to whether the ALJ provided legally sufficient reasons for concluding that Phoenix was not wholly credible.  Based upon a careful review of Phoenix's testimony, the ALJ's credibility analysis, and the portions of the record referenced in that analysis, I conclude that the ALJ did not provide the clear and convincing reasons for rejecting Phoenix's testimony as to the severity of his impairments.  However, given that this action should be remanded for an award of benefits based upon the other errors discussed above, I will not fully set out the basis for my conclusions concerning this matter.  Based upon the ALJ's other errors, including the ALJ's failure to meet the burden of establishing at step five that Phoenix could have performed "other work" in the national economy if he remained sober, I would recommend remanding this action for an award of benefits regardless of my conclusions as to the ALJ's credibility determination.

4. **ALJ's burden at step five**

    Plaintiff contends that the ALJ failed to meet his burden at step five of his disability analysis.  I agree.  As noted above, at the fifth step of the disability analysis, the Commissioner bears the burden of establishing that a claimant who cannot perform his past relevant work can perform other jobs that exist in significant numbers in the national economy.  The ALJ failed to meet that burden here because the VE testified that the kinds of impairments that Dr. Wagner and Dr. Kops ascribed to Phoenix would preclude performance of the jobs cited by the VE.

5. **Summary**

    The ALJ failed to provide the requisite support for rejecting the opinions of Dr. Wagner and Dr. Kops, failed to provide sufficient support for his rejection of lay evidence from Ms. Kelly, failed to provide adequate reasons for finding that Phoenix was not wholly credible, failed to properly account for the VA's disability determination, and relied on evidence from a VE that was inconsistent with medical opinions that had not been validly rejected.  If the improperly rejected opinions, evidence, and testimony were credited, a finding that alcohol and drug use was not material to Phoenix's disability would be required.  Phoenix has died, and the record is complete.

    Under these circumstances, the Commissioner's motion to remand for further proceedings (#14) should be denied, and this action should be remanded to the Agency for an award of benefits.

## **Conclusion**

A Judgment should be entered REMANDING the action to the Agency for an award of benefits.

## **Scheduling Order**

This Findings and Recommendation will be referred to a district judge.  Objections, if any, are due February 28, 2011.  If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

DATED this 8th day February, 2011.


/s/  John Jelderks_____
John Jelderks
U.S. Magistrate Judge